THOMAS H. BIENERT, JR, SBN 135311
LOUIS P. FEUCHTBAUM, SBN 219826
BIENERT, MILLER & WEITZEL
115 Avenida Miramar
San Clemente, California 92672
Telephone (949) 369-3700
Facsimile (949) 369-3701

Attorneys for Defendant
SEYMOUR LAZAR

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>MILBERG WEISS BERSHAD & SCHULMAN LLP, DAVID J. BERSHAD, STEVEN G. SCHULMAN, SEYMOUR LAZAR, and PAUL SELZER<br><br>    Defendants. | Case No.: CR 05-587(A)-JFW<br>Judge John F. Walter<br><br>DEFENDANT SEYMOUR LAZAR'S SENTENCING POSITION<br><br>DATE:  January 28, 2008<br>TIME:   11:00 a.m.<br>CTRM:  16 |

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD, Defendant Seymour Lazar hereby submits this brief for consideration by the Court at his sentencing.

Dated: January 20, 2008                    BIENERT, MILLER & WEITZEL

                                      By:   *S/Louis P. Feuchtbaum*____
                                               Thomas H. Bienert, Jr.
                                               Louis P. Feuchtbaum
                                               ATTORNEYS FOR DEFENDANT
                                               Seymour Lazar

# SENTENCING MEMORANDUM

## I. INTRODUCTION

Seymour Lazar will appear for sentencing after pleading guilty to three felonies in accordance with a plea agreement, which recommends downward departures based upon Mr. Lazar's advanced age and ill health. Though the Court is not bound by that agreement, it provides a fair and just resolution for Mr. Lazar's case and is consistent with the statutory requirements for imposing sentence.

In accordance with that plea agreement, before he even appears for sentencing, Mr. Lazar will have forfeited $1,500,000, to disgorge the value of any benefits he received[1] as a result of his associated conduct. *See* Tabulation of Referral Fees Paid to Seymour Lazar, attached hereto as Exhibit A. He will have amended his income tax returns for any years in question. He will have paid any additional taxes owed and he will be liable to the IRS for any assessed penalties, fines and interest. Mr. Lazar will also pay a $600,000 fine, the maximum allowed by law.

The Court should impose a sentence consistent with the plea agreement because it properly balances considerations for Mr. Lazar's ill health and age with society's legitimate need to punish his criminal conduct. Further, the effect of any sentence is further enforced by the significant decline in Mr. Lazar's health, which occurred during the time he was under indictment.

## II. FACTS

### A. Mr. Lazar's age and declining health support the plea agreement.

Seymour Lazar has already served almost seven months in home confinement, a restriction imposed to ensure he would not flee the jurisdiction while awaiting trial.[2]

---

[1] This amount of referral fees that were paid by Milberg Weiss for Mr. Lazar's benefit on cases in which he or his wife were the class representative, is approximately $1,470,000.

[2] Mr. Lazar was subject to home detention under intensive supervision by probation for 203 days, during the period between his initial arraignment on June 23, 2005 and January 12, 2006, when the court granted his motion seeking to change the conditions of

Additionally, for more than two years he suffered the stress and anxiety of being under indictment while he grew aged and infirm. As described by various physicians, including a doctor retained by the government and another independent doctor who did not have a pre-existing relationship with any party, Mr. Lazar is susceptible to suffer ill effects from stress,[3] which makes it appear likely that the difficulties imposed by the prolonged pendency of the indictment accelerated Mr. Lazar's decline.

The Court record provides detailed measure for several aspects of Mr. Lazar's steep decline that occurred while he was under indictment. Just prior to his first arraignment, Seymour Lazar traveled extensively (RT 158:5-13[4]), was highly articulate (RT 50:21 – 51:3), and was very active in the local business community (RT 148:16-19). Two years later: he shows signs of dementia, or Alzheimer's –like symptoms, which are growing more severe (RT 34:24-35:10, 50:6-18, 89:17-90:15); he often appears inarticulate, having difficulty in choosing words; and, he is limited in his ability to follow complex communication (RT 50:21-51:3; *see also* Dr. Cooper Decl. (Court Document Number ["DN"] 201), ¶¶ 3(b)(i)(2)-(4)). Now, Seymour Lazar's doctors cannot even rely upon him to monitor his own medications (RT 75:7-10, 87:15-18), nor do they believe that he is

---

his pre-trial release. *See* Release Order and Bond Form (Court Document Number ["DN"] DN 15), dtd June 23, 2005. *See also* Release Order and Bond Form (DN 48), dtd January 12, 2006.

[3]  Certainly, anyone who is charged with a serious crime will experience significant stress. The issue here is a much narrower one: Given his advanced age and ill health, the stress imposed over the prolonged period that Mr. Lazar was under indictment likely caused harms, though unintended. Mr. Lazar's own treating physicians described the mechanism by which serious physical harm was likely to occur as a result of stress being imposed upon a person in his condition. (RT 51:25-54:8, 92:6-19. *See also* Dr. Leichman Decl. (DN 200), ¶ 3(b); Dr. Cooper Decl. (DN 201), ¶3(c).) Also, a doctor retained by the government, as well as an independent doctor without any relationship to either party, expressed general agreement with Mr. Lazar's doctors on that issue. (RT 168:11-21, 172:17-25, 174:24-176:5. *See also* Dr. Baer Decl. (DN 159), ¶¶ 1, 4-6.)

[4]  The notation "RT" refers to the Court Reporter's Transcript of testimony that was given at a hearing on May 14, 2007.

capable of providing them with answers to basic questions (*see* Dr. Leichman Decl. (DN 200), ¶¶ 3(a)(vi)(1)(a)-(d)), or with updates regarding his physical condition (RT 33:5-16, 49:16-25, 51:4-9, 88:8-11).  Mr. Lazar has diminished from being a dynamic and highly intelligent man to being a person who has limited concentration, is susceptible to confusion, and has difficulty attending to rudimentary physical tasks.  (RT 50:19-51:12; 51:10-24; *see also* Dr. Cooper Decl. (DN 201), ¶¶ 3(b)(ii)(1)-(3); Dr. Leichman Decl. (DN 200), ¶¶ 3(a)(vi),(v).)

During the two years that Seymour Lazar was under indictment, his physical and mental condition diminished so severely that he would now be incapable of living on his own without assistance (RT 51:10-13).[5]  During those two years, he was twice required to undergo major surgery, he had to deal with the progression of diseases that threatened systemic failures, and he was brought close to death.[6]   During those two years, while he

---

[5]     While Mr. Lazar and his family did note some improvement in his condition following surgery to clear a blocked carotid artery, those improvements appear to have been limited mostly to issues affecting his strength and mobility.  *See, generally*, Defendant's Motion for Order Permitting Travel to Attend his Daughter's Wedding (DN 273).  Unfortunately, the diminished capacities, noted above, continued in spite of that surgery.  (RT 47:10-50:2.)  The cited testimony was provided by Mr. Lazar's doctors approximately two months after surgery on his carotid artery was performed.  (RT 81:13-17.)

[6]     Since Mr. Lazar's deteriorating health has already been fully briefed in other filings and since a full day of hearings was devoted to that issue, counsel will not burden the Court by repeating those details here.  *See, generally,* Defendant's Motion for Reconsideration of Order Setting Conditions of Release (DN 42), Exhibits A-D; Defendant's Motion for Dismissal of First Superseding Indictment With Prejudice for Violation of the Speedy Trial (sic) (DN 146), Exhibit 1; Defendant's Reply to Government's Opposition to Motion for Dismissal of First Superseding Indictment with Prejudice for Violation of the Speedy Trial (sic)(DN 187), Exhibits A-B; Government's Report Re: Lazar's Physical Ability to Stand Trial (DN 180), Exhibit D; Declaration of Dr. Lawrence Leichman Submitted in Response to Court Order Re: Presentation of Expert Testimony ["Dr. Leichman Decl."] (DN 200); Declaration of Dr. W. Lynn Cooper Submitted in Response to Court Order Re: Presentation of Expert Testimony ["Dr. Cooper Decl."] (DN 201); Defendant's Reply to Government's Post-Hearing Memorandum in Opposition to Defendant Seymour Lazar's Motion to Dismiss (DN 245), pp. 4-6, 10-14;

was under indictment, while his freedom was confined, while his health declined, and while he lived with daily worry about this case, Seymour Lazar also had to wonder whether those days of worry would be among his last.

### B. Mr. Lazar fully admits his guilt and to all of the facts supporting his plea.

Mr. Lazar accepts full responsibility for the crimes to which he has pleaded guilty and admits the truth of all the facts that were offered by the government in support of the plea agreement. *See* Statement of Facts in Support of Plea Agreement, attached as Exhibit A to Plea Agreement for Defendant Seymour Lazar. But, taken alone, those facts cannot provide a true measure for Mr. Lazar's character.

### C. Seymour Lazar has led an exemplary life.

Seymour Lazar was born in New York City during June of 1927 where he remained for about the first 10 years of his life, until he and his family moved to California in order to join a large contingent of his mother's family who were already in the state. Mr. Lazar's early life was filled with varied experiences that seems to have presaged the wide and varied experiences that he would have in his adult life. He spent a portion of his childhood growing up on a horse ranch in Van Nuys. He learned accounting from his father, who was a CPA. He did chores as a horse hand. He father also tasked him with maintaining several sets of books. Mr. Lazar attended high school in Los Angeles until he left home for college, and then for war.

---

Declaration of Howard S. Baer, M.D. ["Dr. Baer Decl."] (DN 159)(Examination by independent physician who opined about dangers resulting from Mr. Lazar's labile hypertension and congestive heart failure). It is only fair to note that the government has not always agreed with conclusions regarding the severity of certain of Mr. Lazar's ailments, but there has never been disagreement that Mr. Lazar suffers from several progressive and irreversible, serious diseases. *See* Defendant's Reply to Government's Post-Hearing Memorandum in Opposition to Defendant Seymour Lazar's Motion to Dismiss (DN 245), pp. 7 n. 4,  7 n. 5, 6-9, 12 n. 9, 13-14. *See also* Defendant's Reply to Government's Position Re: Defendant Seymour Lazar's Motion for Order Permitting Travel to Attend Daughter's Wedding in Europe (DN 321), pp. 3-6.

Mr. Lazar attended UC Berkeley from 1944 to 1945. He interrupted his education to serve in the Army during World War II. After receiving an Honorable Discharge from the Army, he went back to Berkeley from where he graduated during 1949 with a BA in Economics. Mr. Lazar then went on to law school, starting at Loyola Law School, and later transferring to USC. He was awarded an LL.M. from USC at sometime around 1952 and was admitted to the bar that year.

Seymour Lazar's career is comprised of a diverse set of challenges and accomplishments. He practiced law for a period of time with Melvin Belli as his partner. His law practice was dedicated to entertainment law and he is responsible for providing many accomplished people with opportunity for their starts. Among others, he represented Lenny Bruce, Miles Davis, Alan Ginsburg, and Bob Dylan. Maya Angelou mentions her gratitude to Seymour in "A Song Flung Up to Heaven," one of her autobiographical works, a sentiment she repeated in her acknowledgements for "The Selected Autobiographies of Maya Angelou," and "All God's Children Need Traveling Shoes." Mr. Lazar left the active practice of law during the early 1960's to become a full-time investor.

Mr. Lazar has also worked in various enterprises that are a very unlikely grouping of jobs. For a time, he was the largest private driller of oil wells and in getting that business going, he actually worked as a hand on an oil rig. He started a lumbering business in Indonesia, but left the country when local militias became threatening. For a time, he was the largest private investor trading on the New York Stock Exchange. He started investing in real estate and became one of the largest private owners of property in the Coachella Valley. However, this list of accomplishments would not adequately reflect Seymour Lazar's character because he has always been devoted to bettering the world around him.

Seymour Lazar has dedicated a large portion of his life to charitable works and has been actively involved in various organizations committed to the betterment of his community. Among these good acts, he provided scholarships at UC Berkeley and served on boards associated with the University, such as: the Berkeley Art Museum, the Berkeley

Anthropology Museum, and he sat on another board to provide financial help for UC Berkeley students in need. He has been a generous donor of art and money to various museums, including: the DeYoung in San Francisco, the Harlem Museum in New York, the Bishop Museum in Hawaii, the Desert Museum in Palm Springs, and the San Francisco Legion of Honor, among others. He provided land to the Bureau of Land Management for a 1.5 mile wilderness trail. He was a dedicated proponent of civil rights when that cause lacked the popularity it would later acquire. But, Mr. Lazar's good acts were not limited to the United States. He has provided assistance for Vietnamese boat people, and he funded an orphanage in Nepal and provided funds that were required to keep a Nepalese rug factory in operation, upon which many people in a town depended to earn their livings. Prior to this case, Mr. Lazar led an exceptional and giving life.

### D. The Pre-Sentence Report

Mr. Lazar agrees with the corrections to the Presentence Investigation Report ("PSR") offered in Government's Position re Sentencing Factors (DN 425). Though it should be noted that the Government's Position was filed with an exhibit entitled "ENC Market Cap Loss" (DN 424) which is not referenced in the Government's Position and which appears unrelated to this case. Additionally, Mr. Lazar notes the following factual errors in the PSR:

1. Pedigree Information regarding related cases:

The section of the PSR that lists pedigree information and related cases fails to identify the government's case against William Lerach, Case number 07 CR 00964 - JFW; and it fails to identify the government's cases against other paid plaintiffs, including, Steven Cooperman, Case number 06 CR 0776 - JFW, and presumably others. *See* PSR, p.2. Mr. Lazar requests that the government identify all defendants in related cases if the Court imposes an order for forfeiture, restitution, or other type of payment as part of Mr. Lazar's sentence for which there is joint and several liability.

/ / /

/ / /

7

2. Statements in the PSR regarding victims:

Mr. Lazar disagrees with the statement in the PSR that there are victims who have been damaged as a result of his actions.

3. Statement regarding amount of "undisclosed kickback payments for the benefit of Lazar."

Mr. Lazar disagrees with probation's claim that $2.6 million in kickback payments were made for his benefit because that amount is incorrect. *See* Letter from Probation Officer Michael Barrett to Honorable John F. Walter, dtd January 28, 2008, p. 3 n. 1.

**D. The Plea Agreement**

The plea agreement is only between Mr. Lazar and the government. Among the terms of the plea agreement, the government and Mr. Lazar agree that:

- Mr. Lazar will pay $1,500,000 in civil forfeiture and this amount will have been fully paid prior to the date of his sentencing (*see* Plea Agreement, ¶ 24);
- Mr. Lazar will pay the $600,000 statutory maximum fine, (*see id.* at ¶¶ 6-12; 22(g));
- The appropriate adjusted offense level under the sentencing guidelines is an offense level 18, (*see id.* at ¶ 19);[7]
- Due to various factors, including considerations for Mr. Lazar's age and health, there should be an 8 level downward departure.
- Mr. Lazar should be sentenced at the low end of the guidelines range for an offense level 10, with a sentence of probation that may be served in home confinement (*see id.* at ¶ 26(h)).

The Guidelines Manual provides for a sentencing range of 6 to 12 months for a defendant with an offense level 10. Mr. Lazar should be sentenced to probation with a 6 month term of home confinement because that would be at the low end of the guidelines range.

///

---

[7] Mr. Lazar and the government agree that the appropriate Sentencing Guidelines are contained in the November, 2001 Guidelines Manual. *See* Plea Agreement, p. 7, ¶ 17.

8

**III.   FACTORS RELEVANT TO IMPOSING AN APPROPRIATE SENTENCE**

When Mr. Lazar appears for sentencing, he will have satisfied all of his obligations under the plea agreement, then due. The Court should impose a sentence that is consistent with the plea agreement because it is sufficient, but not more than necessary to accomplish the legitimate purposes for imposing sentence.

**A.   Statutory factors affecting an appropriate sentence for Mr. Lazar.**

When imposing sentence, a court must consider the nature and circumstances of the offense, along with the defendant's character and history to ensure that the sentence accomplishes specific objectives, identified in statute. *See* 18 U.S.C. § 3553(a).

1.   The nature and circumstances of the offenses:

Mr. Lazar has pleaded guilty to three crimes that involve his lack of personal honesty in his dealings with the government. While much of the relevant conduct pertains to allegations of fraud, it is debatable that Mr. Lazar's conduct fits well within a typical fraud paradigm. In most fraud cases, a defendant's intentional acts cause a describable harm to some identifiable party. Here, it seems debatable whether there are any victims, and if there are, whether they actually suffered harm as a result of Mr. Lazar's actions.

In giving fair consideration to the facts supporting Mr. Lazar's plea, it is also important to note that Mr. Lazar's role is relatively minor as compared to most other defendants in the case. His conduct was not necessary for the existence of Milberg Weiss's arrangement with other paid plaintiffs because the frauds were at all times directed and controlled by the attorneys from Milberg Weiss. The conduct of the other defendants does not appear to have depended upon him in any significant way.

2.   Seymour Lazar's character and history:

Mr. Lazar has no prior criminal history. An accomplished man who has always been dedicated to charitable acts, Seymour Lazar's life history presents a much fuller and more accurate measure of his character than do the facts related to these convictions.

/ / /

/ / /

### 3. The recommended sentence is proper.

The sentence recommended in the plea agreement is proper because it accomplishes the objectives of 18 U.S.C. § 3553 without being greater than necessary to do that. The sentence must: reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; afford adequate deterrence to criminal conduct; protect the public from future crimes of the defendant; and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. §§ 3553(1), (2)(A)-(D).

The sentence proposed in the plea agreement is substantial and it is sufficient. It stigmatizes Mr. Lazar by labeling him as a felon, which will strip him of his law license. While Mr. Lazar has not practiced law for several decades, he has always maintained his bar membership. His legacy with the California State Bar will leave him forever labeled on its rolls as having been forced to leave the profession due to this illegal conduct. The $2,100,000 in fines and forfeitures exceeds the cumulative amount of the maximum fine and the amount required to disgorge profit that Mr. Lazar earned as a result of him being a class representative while also getting paid referral fees. *See* Exhibit A. It provides for a period of probation with its reporting requirements, standard restrictions, and home confinement, which are substantial impositions for an elderly man for whom there is a substantial likelihood that requirements and restrictions that last for any significant period will amount to a lifetime of those requirements and restrictions. But, the most significant part of any punishment is that part that has already occurred during the more than two years that Mr. Lazar was under indictment.

A sentence consistent with the recommendations in the plea agreement would provide adequate general deterrence by setting an example for others, promoting respect for the law and demonstrating the seriousness of the offenses to which Mr. Lazar has pleaded guilty. Felony convictions, disbarment, fines, disgorgement, and the restrictions of probation are sufficient for purposes of general deterrence. The sentence would also promote respect for the law in two different ways. It demonstrates that one cannot

disregard their obligations to be truthful in sworn statements, in representations to courts, or in dealing with government agencies. But, the sentence also demonstrates that we have a legal system that values being humane with people who come before it and admit guilt. The example here would be clear, concessions are being made for Mr. Lazar's health and age because it is the compassionate and just thing to do for a defendant in Mr. Lazar's condition, who is guilty of these types of crimes.

The sentence recommended in the plea agreement is also sufficient as a matter of specific deterrence, to teach Mr. Lazar an adequate lesson so that the community is protected against him ever engaging in similar conduct. The sentence properly accounts for the medical/rehabilitative factors described by the statute because it allows Mr. Lazar to remain where he has free access to his doctors upon whom he relies for his survival.

Further, the sentence recommended in the plea agreement is appropriate when measured against other criteria of the statute. It is appropriate given the types of sentences available (*see* 18U.S.C. § 3553(a)(3)) because it accounts for the seriousness of the crimes, and also because it is proportional given the differences between Mr. Lazar's conduct and situation as compared to the exposure faced by his codefendants for more egregious conduct. The recommended sentence is also consistent with that recommended in the Sentencing Guidelines Manual, which allows consideration for poor health, the need to obtain adequate treatment in allowing a downward departure, and advanced age when it is coupled with physical infirmity. *See* USSG §§ 5H1.4, 5H1.1.

**B.  The Court should credit the 203 days that Mr. Lazar has already served in home confinement against any home confinement ordered as part of his sentence.**

Assuming that the Court imposes a sentence consistent with the sentence recommended in the plea agreement, the Court should credit Mr. Lazar for time already served in home confinement as a condition of his pre-trial confinement. As noted above, Mr. Lazar has already served almost seven months in home confinement (203 days) with

intensive supervision by Probation. This exceeds the amount of time at the low end of the guidelines range recommended by the plea agreement.

It would be unfair to require that a defendant twice serve an identical sentence on the same indictment because that would amount to double punishment. There is no other manner of restoring to Mr. Lazar the time during which he was confined while awaiting trial. "[I]f a person is detained in a pretrial setting, while enjoying the presumption of innocence, it is only fair that the government give him credit for that time at the end of his sentence." *Jonah R. v. Carmona*, 446 F.3d 1000, 1010 (9th Cir. 2006)(internal quotations omitted)(analyzing 18 U.S.C. § 3585(b)).

### C. The Court should remove travel restrictions from Mr. Lazar's standard conditions of probation because they are inapplicable to him and are inconsistent with probation's purpose.

The travel restriction normally imposed by General Order No. 318, which limits a defendant to the Central District of California unless he obtains special permission from probation or the court, should not apply against Mr. Lazar because it is unnecessary and it would be unfairly burdensome for someone of Mr. Lazar's age. This discretionary condition of probation could only be imposed if it is "reasonably necessary" to comply with the purposes for imposing sentence, described in 18 U.S.C. §§ 3553(a)(1)-(2) ["the Sentencing Statute"]. 18 U.S.C. § 3563(b).

Restricting Mr. Lazar's travel to the seven counties that comprise the Central District of California for the recommended two year term of probation would likely be a lifetime restriction on Mr. Lazar's freedom of travel. Such a broad restriction would violate 18 U.S.C. § 3563(b) because it is not reasonably related to any of the purposes described in the Sentencing Statute, nor would the restriction have any relationship to the nature and circumstances of Mr. Lazar's crimes.

Mr. Lazar's presence in the Central District is not necessary for rehabilitation or for ensuring that Mr. Lazar receives training, or employment since Mr. Lazar does not require that. The travel restriction is not necessary to facilitate special monitoring involved for

substance abuse programs because Mr. Lazar is not a substance abuser, so he does not require this type of remediation. It will not be required so that probation can ensure that Mr. Lazar fulfills all of his financial obligations to the Court because those obligations will be fully satisfied within some period shortly after sentence is imposed. Nor is it necessary to protect the community, or because travel would present a risk that Mr. Lazar would become a recidivist since the nature Mr. Lazar's crimes, coupled with his advanced age, make his involvement in other crimes or recidivism an improbability.

### D. Restitution cannot be properly ordered given the facts of this case.

An order for restitution would be inappropriate because the parties to the plea agreement included the $1,500,000 in civil forfeiture as a means to disgorge proceeds resulting from prohibited conduct, which were received by Mr. Lazar. Further, the Court may not order restitution in this case because there are not any identifiable victims. *See* United States Sentencing Commission, *Guidelines Manual* ["USSG"], § 2E1.1 (November, 2001)(where there is no identifiable victim, the court may only order restitution if the defendant was convicted under 21 U.S.C. § 841, § 848(a), § 849, § 856, § 861, or § 863).

## IV. CONCLUSION

The Court should impose sentence in accordance with the recommendations contained in Mr. Lazar's plea agreement, consistent with the low range of an offense level 10, as described in the USSG. That sentence would fully comply with the plea agreement and the Sentencing Statute, if it is limited to the following terms:

(1) Mr. Lazar is ordered to pay the statutory maximum fine of $600,000;

(2) Mr. Lazar is ordered to pay $1,500,000 in civil forfeiture, in accordance with 18U.S.C 981(a)(1)(A);

(3) Mr. Lazar is ordered to serve two years probation, with the following conditions:

/ / /

/ / /

/ / /

    (a)    He will be subject to the Standard Conditions of Probation, as described in General Order 318, EXCEPT number 318(3), which limits freedom of movement to the Central District of California.  Mr. Lazar will be free to travel without restriction, though he is ordered to inform his probation officer of all travel prior to embarking on it.

    (b)    He is sentenced to 6 months home confinement, but time already served in home confinement as a condition of pre-trial release, during the period that Mr. Lazar was under indictment in this case, will be credited against that term.  The Court determines that the term of home confinement has already been fully satisfied.

Dated:  January 20, 2008                      BIENERT, MILLER & WEITZEL

                                        By:    *S/Louis P. Feuchtbaum*
                                                    Thomas H. Bienert, Jr.
                                                    Louis P. Feuchtbaum
                                                    ATTORNEYS FOR DEFENDANT
                                                    Seymour Lazar

# CERTIFICATE OF SERVICE

I, Janine Philips, declare,

That I am a citizen of the United States and am a resident or employed in Orange County, California; that my business address is 115 Avenida Miramar, San Clemente, California 92672; that I am over the age of 18 and not a party to the above-entitled action.

That I am employed by a member of the United States District Court for the Central District of California and at whose direction I caused service of: **DEFENDANT SEYMOUR LAZAR'S SENTENCING POSITION** on the interest parties as follows:

**X  BY ELECTRONIC MAIL:** by electronically filing the foregoing with the Clerk of the District Court using its ECF System pursuant to the Electronic Case Filing provision of the United States District Court General Order and the E-Government Act of 2002, which electronically notifies said parties in this case:

**X  BY OTHER MEANS:** I am "readily familiar" with Bienert, Miller & Weitzel's practice for collecting and processing mail with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business. As such, I caused to be mailed the foregoing document(s) to the following non-ECF participants in this case:

| | |
|---|---|
| AUSA Douglas A. Axel<br>Doug.Axel@usdoj.gov<br>*via electronic mail* | AUSA Robert J. McGahan<br>Robert.McGahan@usdoj.gov<br>*via electronic mail* |
| AUSA Richard E. Robinson<br>Richard.robinson@usdoj.gov<br>*via electronic mail* | Gordon A. Greenberg, Esq.<br>ggreenberg@mwe.com<br>*via electronic mail* |
| Ted W. Cassman, Esq.<br>cassman@achlaw.com<br>*via electronic mail* | David Wiechert, Esq.<br>dwiechert@aol.com<br>*via electronic mail* |
| Bryan D. Daly, Esq.<br>bdaly@beckdecorso.com<br>*via electronic mail* | Andrew M. Lawler, Esq.<br>alawler@amlpc.com<br>*via electronic mail* |
| Julie Ann Salamon, Esq.<br>salamon@achlaw.com<br>*via electronic mail* | Robert D. Luskin, Esq.<br>Patton Bogg LLP<br>2550 M Street, N.W.<br>Washington D.C. 20037<br>rluskin@pattonboggs.com<br>*via U.S. Mail* |

| | |
|---|---|
| Herbert J. Stern, Esq.<br>Alain Liebman, Esq.<br>Stern & Kilcullen<br>75 Livingston Avenue<br>Roseland, NJ  07068<br>dpenn@sghlaw.com<br>aleibman@sgklaw.com<br>*via U.S. Mail* | William W. Taylor III, Esq.<br>Blair G. Brown, Esq.<br>Zuckerman Spaeder LLP<br>1800 M Street N.W.<br>Washington D.C. 20036-5802<br>wwtaylor@zuckerman.com<br>bbrown@zuckerman.com<br>*via U.S. Mail* |
| Officer Brenda Orantes<br>United States Pretrial Services<br>3470 12th Street, Suite 161<br>Riverside, CA 92501<br>*via U.S. Mail* | |

This certificate was executed on January 20, 2008, at San Clemente, California.

I certify under penalty of perjury that the foregoing is true and correct.

<em>S/ Janine Philips</em>_____

16